Filed 7/7/26  In re R.K. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

| | |
|---|---|
| In re R.K., a Person Coming Under the Juvenile Court Law. | C105407 |
| YUBA COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>S.A.,<br>        Defendant and Appellant. | (Super. Ct. No. JVSQ-2400009) |

S.A. (mother) appeals from the juvenile court's orders (1) denying her petition under Welfare and Institutions Code section 388 to modify an earlier order terminating reunification services and (2) terminating parental rights with respect to her son, R.K.[1] She maintains that the juvenile court abused its discretion in rejecting her modification petition and argues that reversing that order would necessarily require the order terminating parental rights to be set aside.  On the record before us, we cannot conclude that the juvenile court acted arbitrarily or unreasonably in denying her modification petition.  We therefore affirm.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

BACKGROUND

I.

Mother gave birth to R.K. in February 2023. Approximately 11 months later, mother went to the hospital for treatment of extensive bruising and pain caused by domestic abuse perpetrated by B.K., R.K.'s father (father). A referral was made to the Yuba County Health and Human Services Department (Department).

In January 2024, the Department filed a section 300 petition alleging a substantial risk of harm under subdivision (b)(1) due to prior and ongoing domestic violence between mother and father in R.K.'s presence and mother's perpetration of domestic violence against her older son's father that resulted in a restraining order against her. The petition also alleged that mother had a history of methamphetamine use, admitted using methamphetamine at least once while pregnant with R.K., and had been forced by father to use as recently as the week before the petition's filing.

The juvenile court detained R.K. and ordered services for mother, including drug testing and treatment, domestic violence classes, and a mental health assessment. The next month, the juvenile court sustained the allegations of the Department's petition, taking jurisdiction over R.K. pursuant to section 300, subdivision (b). At the dispositional hearing that followed, the juvenile court ordered R.K. removed from mother's care with reunification services, including supervised visitation and a batterer's treatment program.

In August 2024, the Department filed its six-month review report in which it recommended that R.K. be returned to mother with family maintenance services. Mother was actively participating in her services, including drug treatment, drug testing, and a batterer's treatment program, and unsupervised overnight visits had been successful. Mother was not residing with father, who was not in compliance with his case plan.

At the six-month review hearing held later that month, the juvenile court returned R.K. to mother with family maintenance services and terminated father's reunification

2

services.  In February 2025, the court extended mother's services another six months to allow her to complete the batterer's treatment program.

II.

In April 2025, the Department filed a supplemental dependency petition (§ 387) alleging that the juvenile court's prior disposition returning R.K. to mother had not been effective in ensuring his safety.  The petition reported that, on April 16, 2025, the Placer County Sheriff responded to a domestic violence incident between mother and her boyfriend, J.C., while R.K. was present.  Officers heard mother and J.C. "arguing, shuffling, and breaking items."  They found methamphetamine pipes and hypodermic needles in the master bedroom.  Mother's drug test was presumptive positive for methamphetamine, and she admitted to child protective services that she had failed to take action to protect R.K.

The Department's detention report on the supplemental petition recommended R.K.'s removal from mother and placement with his former foster family, with whom he had been visiting during family maintenance.  The report detailed events occurring since R.K.'s return to his mother's care, including that mother had moved into an apartment with J.C. and R.K. in December 2024, even after the Department had warned her about J.C.'s criminal history and prior substance abuse.  In January 2025, the Department observed mother with a black eye, which she said was caused by a falling box.  Mother admitted to loudly arguing with J.C. but denied there had been physical violence in the home.  Mother failed to appear on time to drug test on April 11, 2025, resulting in a presumptive positive test.

Mother admitted that J.C. had relapsed a few weeks before the April 16, 2025 incident.  She said that she had learned of the relapse a few days before and that they had been arguing about his drug use when law enforcement arrived.  J.C. tried to leave, but mother would not let him.  J.C. paid for everything, and mother had nowhere else to take

3

R.K.  J.C. admitted that a drug test would be positive for methamphetamine; mother's drug test was presumptive positive for methamphetamine even though she denied use.

The juvenile court detained R.K. on April 23, 2025, noting there was still time for mother to receive additional services prior to the 18-month review.

The Department's April 2025 supplemental jurisdictional report recommended that the juvenile court sustain the supplemental petition and transfer the matter to Placer County.  Regarding the April 16, 2025 incident, the report stated that Placer County officers heard J.C. yell, " '[I]f you don't let me leave, I'm going back to prison.' "  The officers observed two baggies with a white, crystal-like substance in the master bedroom that J.C. admitted was methamphetamine and belonged to him.  Officers issued J.C. a "promise to appear" citation for possession of methamphetamine and drug paraphernalia.  Officers accepted mother and J.C.'s explanation that they had been having rough sex in the living room.  Lab testing confirmed mother's presumptive positive test for methamphetamine.

The supplemental jurisdictional hearing occurred in May 2025.  The social worker updated the juvenile court, advising that mother had completed her batterer's treatment program, provided multiple negative drug tests, missed one test resulting in a presumptive positive test, and engaged in visitation as well as other therapeutic services.  Mother submitted on the supplemental jurisdictional report.  The Department withdrew its recommendation to transfer the matter to Placer County given the short time remaining to complete the case.  The court determined that it would not be in R.K.'s best interest to transfer the case, continued mother's services, and sustained the allegations in the supplemental petition.

The Department's June 2025 disposition report recommended additional reunification services for mother.  The report noted that J.C. had moved out of the home following R.K.'s detention, but mother remained in a relationship with him and asked that he be allowed to attend virtual visits with R.K.  Mother was unemployed but looking

4

for a job. Mother used methamphetamine off and on for three years while seeing father, completed drug treatment in September 2024, and was re-referred for a substance abuse assessment in June 2025. Mother's visits with R.K. were positive; she accepted all additional services and expressed her desire for R.K. to be returned to her care. At the June 2025 dispositional hearing, the juvenile court ordered additional reunification services leading up to the 18-month review hearing.

III.

The Department filed its 18-month review report in July 2025 recommending the termination of mother's reunification services. The report described mother's participation in various services, including therapy, parenting courses, codependency support group meetings, and Narcotics Anonymous meetings. Despite these efforts, mother continued to deny the reasons leading to the dependency and supplemental dependency petitions. Although J.C. no longer lived in mother's home, he still had belongings and would eat dinner there. Mother remained in a relationship with J.C., thought of him as R.K.'s father, wanted them to be a family, and denied instances of domestic violence between them. Mother also denied that she had relapsed, despite positive drug tests. She was presumed positive for no call/no show drug tests on May 7 and 28, 2025. She tested positive for methamphetamine on June 6, 2025. Mother's hair follicle sample collected on June 20, 2025 was positive for methamphetamine, but mother blamed the result on "environmental exposure." The Department's efforts to verify the asserted "environmental exposure" were unsuccessful. Mother also denied that the methamphetamine and drug paraphernalia discovered in her home were accessible to R.K.

Based on mother's significant history of engaging in domestic violence in her past and current relationships and her continued denial of "any relapse or domestic violence incident in the home," the Department remained concerned that mother would engage in domestic violence while R.K. was present. The Department observed that mother "made

5

sustainable progress in her previous case plans and the current case plan," but then "ended up in a subsequent case with similar allegations of domestic violence and substance abuse." Mother lost custody of her older child as a result of engaging in domestic violence in his presence, and by this point, R.K. had been detained twice for similar reasons. In the Department's view, mother "has shown an apparent lack of accountability[,] and there are no new services available that could be put in place[] to address these ongoing concerns."

The contested 18-month review hearing occurred on July 23, 2025. Mother made an offer of proof, which counsel for R.K. and the Department accepted, that if mother were to testify, she would say that: she was no longer in a romantic relationship with J.C. and did not live with him; she accepted and agreed that the June 6, 2025 drug test was not a false positive; and "she has not actively used methamphetamine in 18 months." Mother argued that she had diligently complied with her case plan and that vague concerns about a parent maintaining contact with an abusive partner could not establish a substantial risk of harm to the child. R.K.'s counsel argued that mother's positive drug tests and the presence of methamphetamine and hypodermic needles in the home—after she had received extensive services—meant that mother could not provide a safe environment for R.K.

The juvenile court adopted the Department's recommendation and terminated mother's reunification services. The court found that mother remained in denial over her substance use and failed to recognize the dangers of associating with people who abused drugs. Without an understanding of these dangers and taking accountability for them, especially after participating in extensive services, there remained a substantial risk that the conditions leading to R.K.'s removal would recur. The juvenile court set the matter for a permanency planning hearing under section 366.26.

IV.

In November 2025, the Department filed its section 366.26 report recommending termination of parental rights and adoption as R.K.'s permanent plan. According to that report, in early October 2025, mother advised the Department that she had obtained her own housing and was no longer in contact with J.C. Later that same month, however, mother's car was towed, and she started using J.C.'s vehicle to visit R.K. Mother was still unemployed but looking for work. Her drug tests following the termination of reunification services were negative except for an oral swab in September 2025 that screened positive for cocaine, but the result was not confirmed due to insufficient sample quantity. Mother continued to attend Narcotics Anonymous meetings, codependency classes, and therapy. Mother's older son remained outside her care because of domestic violence issues. The report also discussed the adoption assessment, which concluded that R.K. was likely to be adopted. His potential adoptive parents had been a consistent part of his life, and they were committed to adopting him.

The week before the section 366.26 hearing, mother (through counsel) filed a request to change order pursuant to section 388, seeking R.K.'s return to her care with family maintenance services. Mother stated that she had secured housing that she could independently afford, was working, continued to test negative for drugs and participate in outpatient drug treatment, and continued to participate in codependency classes and therapy. Mother argued that returning R.K. to her with family maintenance was in his best interest because she had cared for him for nine months prior to his re-detention, and the two were bonded as demonstrated by their positive, supportive visits. Mother urged that "[m]aintaining this emotional bond is critical to his development and well-being and … severing that bond would be detrimental to R.K."

The juvenile court considered both the Department's section 366.26 report and mother's modification petition at a December 18, 2025 hearing. Mother testified as the only witness. She stated that her relationship with J.C. ended after the 18-month review

7

hearing in July 2025 because she understood "he was a huge problem for the court." Mother said she had "no contact with him whatsoever" since then. With regard to her use of J.C.'s car, she said that J.C. had left it for her use in April 2025, and she drove it until she obtained her own vehicle in August 2025; she also drove J.C.'s car to a few visits with R.K. in October 2025 due to issues with her own vehicle, but then returned it to his sister's home that same month. Mother denied that she had discussed the car with J.C. after he gave her permission to use it in April 2025. Even though mother had originally asked that J.C. receive services, she had been "persuaded otherwise" and no longer believed it was in R.K.'s best interest to have a relationship with him. Mother admitted she had a "long-term problem" of "violent relationships" before her relationship with J.C., but she denied experiencing domestic violence since her relationship with father. When asked about law enforcement being called to the home she shared with J.C. because of domestic violence concerns, mother blamed the thin walls of the apartment for the noise reaching the neighbors and maintained that R.K. was asleep in his room and had not heard anything. Mother regretted her relationship with J.C. and believed she had the skills to avoid codependent relationships in the future.

Mother further testified that she had a long history of methamphetamine problems, but said that she had continued to test negative. She acknowledged that law enforcement officers found methamphetamine on the nightstand in her bedroom but denied knowing that J.C. had relapsed. Mother believed J.C. when he told her that he had not used since his relapse in April. She maintained that she herself had gone 18 months without using methamphetamine. When asked if she continued "to deny drug use even in light of" her positive test on June 6, mother responded, "Yes."

After hearing mother's testimony and the arguments of counsel, the juvenile court denied mother's petition. The court acknowledged that mother had "done a lot to change the circumstances" but observed that "unless and until [parents] acknowledge there is a problem, [participation in programs] is not going to do any good." Without speculating

8

on whether mother would enter another relationship like the one with J.C., the court found her testimony was not credible. Mother was attending domestic violence classes during the nine months in which R.K. was returned to her care, but refused to acknowledge that her relationship with J.C. was marred by domestic violence. She refused to acknowledge that she was repeating the same pattern as her relationship with father or that R.K. had been affected. Mother also refused to acknowledge her responsibility for the positive drug tests, despite being separated from J.C. Although mother had completed services, she had not internalized their lessons and had failed to gain insight into the causes for the dependency. Given R.K.'s age, the court found that no plan other than adoption "would be appropriate," adding that its findings were "made in the best interest of the child." The court thus declined to restore reunification services. It then addressed the issues under section 366.26, terminated mother's parental rights, and selected adoption as R.K.'s permanent plan.

Mother filed a timely notice of appeal from the juvenile court's orders denying her section 388 petition and terminating parental rights. In her briefing in this court, she challenges only the order denying her section 388 petition.

DISCUSSION

Section 388 permits modification of a dependency order if the petitioning party establishes by a preponderance of the evidence: (1) a change of circumstance or new evidence and (2) the proposed modification is in the best interests of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317, 325; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526.) The statute provides an " 'escape mechanism' " for parents facing termination of their parental rights by allowing the juvenile court to consider a legitimate change in the parent's circumstances after reunification services have been terminated. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) After the termination of reunification services, "[i]t is presumed … that continued care is in the best interest of the child. The parent,

9

however, may rebut that presumption by showing that circumstances have changed that would warrant further consideration of reunification." (*Id.* at p. 310.)

" 'Not every change in circumstance can justify modification of a prior order.' " (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.) The proffered change in circumstances " 'must be substantial.' " (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.) "A parent establishes a substantial change of circumstances for purposes of section 388 by showing that, during the period between termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction." (*Id.* at p. 846.) The circumstances must be changed, not merely changing. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

A modification petition "is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 319.) The question on appeal is "whether the trial court exceeded the bounds of reason." (*Id.* at pp. 318-319.)

Here, although the juvenile court did not recite specific findings for each element of section 388, we conclude the court could reasonably find that neither element of the statute was satisfied. With respect to changed circumstances, the juvenile court heard mother's testimony about the changes she claimed to have made and found it not credible. The juvenile court explained that, although mother had undertaken efforts to change her circumstances, she continued to deny the issues leading to R.K.'s removal and failed to recognize the risks to his safety. That finding was sufficiently supported by the evidence. Among other things, mother expressly denied using drugs, notwithstanding positive tests. She also failed to acknowledge the threat posed by the methamphetamine and hypodermic needles found on a nightstand in her bedroom; and she denied

10

knowledge that J.C. had been using. Mother likewise continued to deny domestic violence in her relationship with J.C. and its effects on R.K., notwithstanding evidence that she appeared at the Department with a black eye and her neighbors contacted law enforcement with concerns about violence while R.K. was in the home.

Mother maintains that the juvenile court relied on irrelevant, outdated, and unsupported facts, but its findings concerning mother's attitudes and behaviors were substantially based on its firsthand observation of mother's testimony at the hearing on her petition. And as we have noted, the court's evaluation of her testimony finds adequate support in the record. In that circumstance, an appellate court has no ground to reach a contrary conclusion. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 319.)

With respect to the best interest of the minor, a juvenile court may consider a range of factors, including: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.) Here, the juvenile court focused both on the seriousness of the problem and the degree to which it had been ameliorated, and as we have explained, there is substantial evidence of the court's concerns on both fronts. Mother points to numerous reports of positive and loving interactions between her and R.K. during visits. These, indeed, support her claim of a strong parent-child bond. But even if reasonable minds could disagree on whether preserving that bond was in R.K.'s best interest, we cannot say that a contrary finding was arbitrary or unreasonable. The juvenile court had a record before it of a parent who, notwithstanding participation in significant services, was not able to maintain a safe environment for her young son after regaining custody following his initial removal and who, up to the hearing on the section 388 petition, continued to display attitudes and behaviors that showed a risk of recurrence. On that record, the juvenile court did not act

unreasonably in finding that mother had failed to rebut the presumption that R.K.'s interest in stability outweighed mother's interest in reunification.  (See *In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310; *In re Alayah J.* (2017) 9 Cal.App.5th 469, 478; *In re Jasmon O.*, *supra*, 8 Cal.4th at p. 415.)

DISPOSITION

The judgment is affirmed.

/s/
FEINBERG, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
WISEMAN, J.*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.